IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE LACKNER, | ) | CASE NO. 1:21-CV-00270-DAR |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DAVID A. RUIZ |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY | ) | JONATHAN D. GREENBERG |
| ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Nicole Lackner ("Plaintiff" or "Lackner"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further proceedings consistent with this opinion.

## I. PROCEDURAL HISTORY

In March 2019, Lackner filed an application for SSI, alleging a disability onset date of July 1, 2017[2] and claiming she was disabled due to lupus, asthma, and Raynaud's disease. (Transcript ("Tr.") 39,

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] Under 20 C.F.R. § 416.335, SSI benefits are payable as of the month following the month of application. Therefore, the period at issue begins on March 14, 2019, the date of application, regardless of the alleged onset date.

84, 103.)  The application was denied initially and upon reconsideration, and Lackner requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 39.)

On July 14, 2020, an ALJ held a hearing, during which Lackner, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On September 10, 2020, the ALJ issued a written decision finding Lackner was not disabled.  (*Id.* at 39-57.)  The ALJ's decision became final on January 5, 2021, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On February 2, 2021, Lackner filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 13, 15.)  Lackner asserts the following assignments of error:

(1)     The ALJ erred in his evaluation of the opinion evidence.

(2)     New and material evidence warrants remand.

(Doc. No. 13 at 14, 19.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Lackner was born in February 1998 and was 22 years-old at the time of her administrative hearing (Tr. 39, 55), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 416.963(c).  She has a limited education and is able to communicate in English.  (Tr. 55.)  She has no past relevant work.  (*Id.*)

### B.    Medical Evidence[3]

On September 11, 2018, Lackner went to the emergency room at LakeHealth West for complaints of leg numbness and confusion that stemmed from an adverse reaction to Topamax.  (Tr. 1679.)

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

Treatment providers directed Lackner to discontinue the medication and follow up with her neurologist. (*Id.*)  A lumbar MRI and brain CT taken that day were normal.  (*Id.* at 1703.)

On September 25, 2018, Lackner returned to the emergency room with recurrent seizures and headache.  (*Id.* at 1619.)  Lackner reported her last seizure was seven months ago while still pregnant before having one that day and being found by her significant other's father with generalized tonic-clonic activity.  (*Id.*)  Heather Godale, M.D., noted Lackner was "still slightly postictal" and had been given Ativan.  (*Id.*)  Godale diagnosed Lackner with seizures and migraines.  (*Id.* at 1631.)

On October 1, 2018, Lackner returned to the emergency room, this time taken by EMS, for additional seizure activity.  (*Id.* at 1722.)  Lackner complained of generalized convulsions that began 30 minutes before arrival, severe headache, confusion, lightheadedness, and nausea.  (*Id.*)  On examination, Lackner moved all extremities equally, although she gave poor effort for strength training, and had normal finger-nose-finger testing.  (*Id.* at 1724.)  A brain CT taken that day was normal.  (*Id.* at 1728.)  The attending physician spoke with Lackner's primary care physician, who thought there may be a psychiatric component to Lackner's seizures.  (*Id.*)  Treatment providers diagnosed Lackner with a seizure.  (*Id.* at 1741.)

From October 6, 2018 through October 12, 2018, Lackner underwent continuous video monitored EEG testing at the Cleveland Clinic Epilepsy Monitoring Unit that revealed no active epilepsy.  (*Id.* at 546, 548.)  While the EEG was inconclusive as to seizures, treatment providers had a concern for PNES given the spells recorded during her hospital stay.  (*Id.* at 548.)  On examination at discharge, Lackner had normal muscle tone, giveaway weakness during strength testing that "improved significantly with distraction and encouragement," resulting in "at least 4+/5" strength, 2/5 deep tendon reflexes, mute plantar reflex, no evidence of postural or action tremor, no dysmetria seen on finger-nose-finger testing or

heel to shin testing, subjective diminishment to pin prick on the right compared to the left, and intact sensation to vibration.  (*Id.* at 549.)

On November 26, 2018, Lackner saw Howard Smith, M.D., for evaluation of possible lupus.  (*Id.* at 511, 516.)  Lackner complained of pins and needles and abnormal sensations in her arms and legs since October 2018.  (*Id.* at 511.)  Lackner reported pain in her lower legs, left wrist, neck, and upper back, blotches on her hands and intermittent purple discoloration of her hands, difficulty with arm strength and hand strength, dry eyes, red eyes, eye swelling, intermittent itchy rash, extreme fatigue after being in the sun, and paying for it the next day if she did too much one day.  (*Id.*)  On examination, Dr. Smith found intact sensation, normal strength, normal gait, normal range of motion of all extremity joints, no evidence of active synovitis, diffuse tenderness to palpation over the musculature, and the ability to make full fists bilaterally.  (*Id.* at 514.)  Dr. Smith found no clinical signs or symptoms consistent with lupus or other ANA spectrum disorder.  (*Id.*)  Rather, Dr. Smith believed Lackner suffered from fibromyalgia/central sensitization.  (*Id.* at 514-15.)  Dr. Smith recommended rechecking Lackner's ANA and dsDNA, and checking her Vitamin D, TSH, and UA levels.  (*Id.* at 515.)

On February 12, 2019, Lackner saw Kim Merner, CNP, for follow up after her EMU stay.  (*Id.* at 508.)  Merner noted that four typical spells were captured of Lackner's body movements, but no EEG changes or interictal changes were captured during her stay.  (*Id.*)  Lackner reported having discontinued Vimpat because she was experiencing heart palpitations, "feeling off," and was afraid she would not wake up to hear her son at night.  (*Id.* at 508-09.)  However, Lackner denied any spells since discharge from the hospital.  (*Id.* at 508.)  Lackner reported high anxiety, for which she was requesting medication, and told Merner it was stressful being home with a one-year-old all day.  (*Id.*)  Merner prescribed Zonegran, folic acid, and an inhaler, and explained to Lackner why she needed to be on an AED medication.  (*Id.* at 509.)  Merner also told Lackner she needed to see a counselor to destress.  (*Id.*)

4

On February 16, 2019, Lackner saw her primary care physician, Dr. Shreeniwas Lele, for follow up.  (*Id.* at 886.)  Lackner reported bilateral leg cramping and bluish discoloration, as well as feeling very cold and not well.  (*Id.*)  Lackner complained of a worsening malar rash, for which she was seeing a rheumatologist.  (*Id.*)  On examination, Dr. Lele found no edema of the legs, "okay" dorsalis pedal pulses, normal reflexes, and normal sensory and motor examinations.  (*Id.*)  Lackner's diagnoses included Raynaud's phenomenon with decreased circulation in the legs, for which a PVR was ordered, chronic pain syndrome, for which Lackner was referred to a chronic pain clinic, bone and joint arthritis, GERD, arthritis, anxiety, and stress.  (*Id.*)

On February 18, 2019, Lackner saw rheumatologist Van Warren, M.D., for complaints of left leg pain that she rated as a 7/10.  (*Id.* at 662.)  Lackner reported "significant pain" in her left leg from her thigh down to her foot, purple discoloration of her feet, blotches and discoloration of her calves, easy bruising, pain in her arm from her hand up to her shoulder, blotchy discoloration of her face, muscle spasms of her eyes, and no seizures for the past four months despite having stopped anti-seizure medication a year ago. (*Id.*)  On examination, Dr. Warren found normal range of motion of the upper and lower extremity joints without any joint effusions, faint purplish discoloration of the tips of her toes, a few areas of ecchymosis on the right posterior calf, and erythema in the malar aspect of the face bilaterally. (*Id.*)  Dr. Warren diagnosed Lackner with systemic lupus erythematosus, unspecified, and seizure disorder in pregnancy.  (*Id.* at 666.)

On March 6, 2019, Lackner went to the emergency room with complaints of a rash and abdominal pain.  (*Id.* at 1212.)  Lackner rated her abdominal pain as an 8/10 at its worst and described it as burning, sharp, and stabbing.  (*Id.*)  On examination, treatment providers found mild tenderness to palpation in the super-pubic area with a feeling of pressure, no edema, and no obvious deformities of the extremities.  (*Id.*

5

at 1224.) A pelvic ultrasound was normal. (*Id.* at 1231.) Lackner's diagnoses included abdominal pain, leukocytosis, and skin eruption. (*Id.* at 1225, 1231.)

On March 8, 2019, Lackner went to the emergency room with complaints of abdominal pain since she started her medication for lupus. (*Id.* at 1820.) Lackner rated her pain as a 10/10 at worst and described it as sharp and throbbing. (*Id.*) Lackner also reported constipation. (*Id.* at 1827.) Her primary care doctor and her rheumatologist encouraged her to go to the emergency room. (*Id.*) An abdominal CT taken that day revealed a large amount of formed stool in the right colon and transverse colon, likely indicating constipation. (*Id.* at 1841.) No other abnormalities were noted. (*Id.*) Lackner's diagnoses included constipation and abdominal pain. (*Id.* at 1853.)

On March 14, 2019, Lackner saw Dr. Lele for follow up. (*Id.* at 880.) Lackner reported abdominal pain, nausea, dyspepsia, constipation, weakness, lethargy, tiredness, fatigue, and exhaustion. (*Id.*) Dr. Lele noted Lackner was in the emergency room for a kidney stone and the constipation was probably a medication side effect. (*Id.*) On examination, Dr. Lele found diffuse tenderness of the abdomen, no edema of the legs, normal reflexes, and normal sensory and motor examinations. (*Id.*) Dr. Lele prescribed Colace and magnesium citrate and recommended drinking more water and a high fiber diet for Lackner's constipation. (*Id.*) Dr. Lele thought Lackner may have IBS. (*Id.*) Dr. Lele ordered testing for ammonia levels and blood count and noted he would monitor Lackner's weakness. (*Id.*)

On April 7, 2019, Lackner completed an adult function report. (*Id.* at 230-37.) Lackner lived with her parents. (*Id.* at 230.) She reported she had limited exposure to cold environments, direct sunlight, prolonged standing and walking, and climbing stairs and ladders, and she could not perform repetitive movements with her hands and upper extremities for prolonged periods of time. (*Id.*) Lackner spent the day making breakfast for her son, getting him dressed, and letting him play, taking her medication, napping when her son napped, making him lunch, watching him play, making dinner, and going to bed.

6

(*Id.* at 231.) Her pain woke her in the middle of the night or caused her problems in falling asleep. (*Id.*) Some days she could hardly move to change her clothes, and sometimes she lacked the energy to bathe and the warmth hurt her body. (*Id.*) She needed help remembering her medication. (*Id.* at 232.) She made simple meals such as sandwiches, macaroni and cheese, and hot dogs daily. (*Id.*) She could do laundry and clean up after her son. (*Id.*) She went outside once a day. (*Id.* at 233.) She did not drive and did not go out alone. (*Id.*) She shopped in stores and by telephone for food, clothes, diapers, wipes, and hygiene items. (*Id.*) She did not have bills and did not have any money, and she had never used a checkbook or money order. (*Id.*) She reported she could not take long walks, could not drive, and was unable to work. (*Id.* at 234.) She needed to rest for 10 minutes after walking for 10 minutes. (*Id.*) She reported getting side-tracked easily, it took her a while to understand things, and she needed to be "hands on to understand things." (*Id.*) She listened to music and spent time with her son. (*Id.* at 235.) Sometimes her mom needed to help. (*Id.*) She could not hold her son more than 20 minutes. (*Id.*) She spent time with others and spoke to others on the phone, and she went to the store regularly. (*Id.*) She got along well with authority figures and had never been laid off because of issues getting along with others. (*Id.* at 236.) She did not handle stress well, and she got bad migraines and could have a seizure. (*Id.*) She did not handle change well and she was used to routine. (*Id.*)

On April 10, 2019, Lackner underwent vascular testing that revealed no arterial occlusive disease bilaterally. (*Id.* at 869-70.)

On May 30, 2019, Lackner underwent a consultative psychological evaluation with Julie Janco-Gidley, Ph.D. (*Id.* at 1142.) Lackner described her lupus, Raynaud's syndrome, colon issues, possible IBS, and epilepsy as the reasons for her disability, along with her severe migraines, anxiety, and PTSD. (*Id.*) Lackner reported living with her mother, although she was moving into her own apartment with her young son soon, and she denied having friends or a social life. (*Id.* at 1143.) Lackner told Dr. Janco-

7

Gidley she had completed 10th grade and had been unable to get her GED because of anxiety, transportation issues, and cost. (*Id.*) Lackner reported problems with her legs from the hips down and that she could not walk at times, as well as needles and numbness in her legs and left arm that felt like she was being electrocuted. (*Id.* at 1144.) Lackner told Dr. Janco-Gidley she was not allowed to work or be in cold environments because of her Reynaud's, since it caused sharp pains in her arms and legs. (*Id.*) Lackner described her seizures as getting hot, getting blurry vision and ringing ears, and passing out. (*Id.* at 1145.) Lackner also reported a diagnosis of fibromyalgia with intermittent brain fog. (*Id.*) Lackner told Dr. Janco-Gidley she had concentration problems and struggled to make decisions. (*Id.*) Lackner reported anxiety attacks, panic attacks, and memory problems. (*Id.* at 1146.) Lackner told Dr. Janco-Gidley she had been fired from her most recent job as a cashier at BJ's because she had bad anxiety that turned into an asthma attack and required a hospital visit; since she missed four days after just starting work there, she was fired immediately. (*Id.* at 1148.) Lackner denied current mental health treatment, although she was planning to go back. (*Id.*)

On examination, Dr. Janco-Gidley found Lackner friendly and cooperative, with a "slightly anxious" mood at times and "slightly melancholy or down." (*Id.* at 1149.) Lackner demonstrated a "slightly blunted" affect at times, although it was in the normal range otherwise. (*Id.*) Lackner reported a fatigued mood, that she had a migraine, and her body was very sore. (*Id.*) Lackner reported feeling anxious, and Dr. Janco-Gidley noted Lackner appeared anxious at times during the interview. (*Id.*) Lackner knew the meaning of "what goes around comes around," but did not know what the phrase "Don't count your chickens before they hatch" meant. (*Id.*) Lackner could spell a simple word forward and backward, and she could do simple calculations and serials 3s from 20, although she struggled with the latter and took a long time to come to some of the answers. (*Id.*) Lackner recited three objects immediately but only one after five minutes, although she recalled the other two after receiving retrieval

8

cues.  (*Id.*)  She could recall four digits forward and three digits backwards, although not consistently and she made an error on one trial.  (*Id.*)  Dr. Janco-Gidley estimated Lackner's cognitive functioning to be in the below average range.  (*Id.*)  Dr. Janco-Gidley determined Lackner's insight and judgment appeared adequate at the time of examination.  (*Id.*)  Lackner demonstrated appropriate eye contact and did not exhibit any looseness of association, although she was distracted at times and had a tendency to go off on tangents or go beyond what was necessary to answer the question asked.  (*Id.* at 1149.)  Lackner reported difficulty concentrating at the end of the interview because of her migraine.  (*Id.* at 1150.)  Dr. Janco-Gidley diagnosed Lackner with unspecified depressive disorder, other specified anxiety disorder, and PTSD.  (*Id.* at 1153.)

Dr. Janco-Gidley opined Lackner "seems as though she has some struggles" with her ability to understand, remember, and carry out instructions, so while she would likely be able to understand and follow simple instructions given one at a time, she may benefit from written instructions to which she could refer as needed.  (*Id.* at 1152.)  Since Lackner "reports having some struggles being able to maintain attention and concentration adequately," Dr. Janco-Gidley opined "she may take more time than peers to perform tasks especially if tasks are difficult or involve multiple steps," and "[m]ood issues" may impact her functioning in this area.  (*Id.*)  Dr. Janco-Gidley noted Lackner "seems to have had some struggles being able to respond to supervision and others in the work setting."  (*Id.* at 1152-53.)  Dr. Janco-Gidley opined that Lackner "seems to have had some difficulty responding to pressure in the work place," and that "[m]ood issues" may have an impact on her functioning in this area and may result in her feeling overwhelmed, incapable, and/or unmotivated in the workplace if she was currently employed.  (*Id.*)

On June 10, 2019, Lackner saw Dr. Warren for follow up.  (*Id.* at 1160.)  Lackner complained of right wrist pain, as well as recurrent pain in her hands that went up to her arms.  (*Id.*)  She reported pain in the shoulders, pain and swelling in the right knee, and a malar rash with sun exposure.  (*Id.*)  Lackner also

complained of pale discoloration of her right leg. (*Id.*) Lackner further reported some discomfort in the ulnar aspect of her left forearm. (*Id.*) On examination, Dr. Warren found good passive range of motion of the upper and lower extremities, soft tissue thickening of the right knee, no other joint effusions, tenderness along the proximal medial aspect of the left forearm, negative straight leg raise bilaterally, 4-5/5 strength in the right hip flexor, 4/5 strength in the left hip flexor, and pain in the distal anterior aspect of the thighs with hip flexion against resistance. (*Id.*) Dr. Warren increased Lackner's medication and prescribed a Dosepak for Lackner to take as needed for severe pain or joint symptoms. (*Id.*)

That same day, Dr. Warren wrote a letter stating that Lackner had systemic lupus erythematosus and a seizure disorder with symptoms including recurrent rashes, circulatory problems that were worse with cold exposure, joint symptoms, and paresthesia consistent with neurogenic etiologies objects involving the neck and low back. (*Id.* at 1156.) Dr. Warren opined that Lackner was unable to maintain gainful employment, had a limited capacity for sun exposure and cold exposure, and was unable to do any repetitive movements with the upper or lower extremities. (*Id.*) Dr. Warren stated these restrictions would last from June 10, 2019 through October 10, 2019. (*Id.*)

On July 28, 2019, Lackner went to the TriPoint Medical Center emergency room with complaints of spasticity of her low back and bilateral lower extremities as well as possible STD exposure. (*Id.* at 1183.) On examination, treatment providers found no edema, movement of extremities, no midline spinous process tenderness to palpation, mild spasm of the bilateral lumbar paraspinous muscle region, negative straight leg raise, and the ability to stand from a seated position without significant difficulty. (*Id.* at 1184.) Treatment providers diagnosed Lackner with bilateral lumbar spinous muscle spasms, possible STD exposure, and positive pregnancy test. (*Id.* at 1187.)

The next day, on July 29, 2019, Lackner went to the Lake Health West emergency room complaining of active tremors since the previous Wednesday and abdominal pain. (*Id.* at 1940.) Lackner

reported she thought she was also having a lupus flare.  (*Id.*)  Treatment providers diagnosed Lackner with abdominal pain in pregnancy and stomach cramps.  (*Id.* at 1958.)

On September 10, 2019, Lackner went to the emergency room for complaints of a headache that started suddenly when she went outside and shakiness.  (*Id.* at 3679.)  Lackner stated that before the start of her headache her ears started ringing and she felt hot all over.  (*Id.* at 3684.)  Lackner had not taken anything for her headache; she went straight to the emergency room.  (*Id.* at 3691.)  Lackner could not remember what she was to take when she had a headache.  (*Id.*)  Lackner denied numbness and tingling, as well as visual deficits and tinnitus.  (*Id.*)  On examination, treatment providers found intact cranial nerves, power intact in the upper and lower extremities, and sensation intact in the upper and lower extremities.  (*Id.* at 3692.)  Lackner reported she had experienced headaches like this during her previous pregnancy.  (*Id.* at 3697.)  Treatment providers administered fluids, Benadryl, and Tylenol and Lackner reported her headache had improved.  (*Id.*)  Treatment providers diagnosed Lackner with acute headache. (*Id.* at 3705.)

On September 25, 2019, Lackner went to the emergency room via EMS with complaints of chest pain that started that day and radiated to her right side, as well as lower abdominal pain and anxiety.  (*Id.* at 3627, 3633.)  Lackner reported being under a lot of stress at the time and "dealing with the 'court system.'"  (*Id.* at 3633.)  On examination, treatment providers found occasional tremors of extremities, no edema, and movement of extremities.  (*Id.* at 3641.)  An x-ray taken that day showed no acute cardiopulmonary process, and an ultrasound revealed no abnormality.  (*Id.* at 3644.)  Treatment providers diagnosed Lackner with right-sided pelvic discomfort, anxiety, and chest tightness.  (*Id.* at 3645.)

From January 15, 2020 through January 20, 2020, Lackner was admitted to University Hospital for severe preeclampsia that resulted in a premature cesarean delivery.  (*Id.* at 3930, 3935, 3940, 3945.)  On January 19, 2020, Lackner underwent a psychiatric consultation by Tiffany Gee, M.D., given Lackner's

11

mental health history and current stressors.  (*Id.* at 3930-33.)  Lackner reported a stable mood, but worsening anxiety because of interpersonal issues with the father of her children, and that her stress could get so severe as to induce seizures.  (*Id.* at 3930.)  On examination, Dr. Gee found adequate grooming and hygiene, calm, cooperative attitude, appropriate eye contact, normal speech, euthymic mood, appropriate affect, a coherent, logical, and linear thought process, and fair judgment and insight.  (*Id.* at 3931.)  Dr. Gee diagnosed Lackner with major depression, chronic, in remission, generalized anxiety disorder, borderline personality disorder by history, and PTSD.  (*Id.* at 3932.)  Dr. Gee prescribed Buspar for anxiety.  (*Id.* at 3933.)

On June 22, 2020, Dr. Warren completed a medical source statement regarding Lackner's physical abilities.  (*Id.* at 3948-49.)  Dr. Warren opined Lackner could lift 10 pounds frequently and 20 pounds occasionally, basing his assessment on tenderness in Lackner's upper arms and knees and paresthesia of her hands and feet.  (*Id.* at 3948.)  Dr. Warren further opined Lackner could stand and walk for three hours out of an eight-hour day but only 30 minutes without interruption, basing his assessment on paresthesia in the feet with Raynaud's phenomenon.  (*Id.*)  Dr. Warren further opined Lackner could sit for five hours out of an eight-hour day but only two hours without interruption, basing his assessment on dependent purple discoloration of Lackner's feet and lower legs.  (*Id.*)  Lackner could occasionally climb, stoop, reach, push, pull, and perform gross manipulation, and could rarely balance, crouch, kneel, crawl, and perform fine manipulation.  (*Id.* at 3948-49.)  Dr. Warren based these assessments on Lackner's left retrobulbar headaches, pain in her knees and proximal aspects of her arms, numbness in the fingers of both hands, tenderness in her upper arms, and cold fingers and toes which may limit fine manipulation and pulling objects.  (*Id.*)  Dr. Warren further opined that Lackner needed to change her position at will, elevate her legs to 45 degrees at will, and would require an additional two hours of rest periods in addition to normal lunch and work breaks.  (*Id.* at 3949.)  Dr. Warren further opined that pain would interfere with

Lackner's concentration, take her off task, and cause absenteeism.  (*Id.*)  Dr. Warren stated Lackner's function was "limited by headaches, numbness in feet, burning sensation in hands and pain in upper arms."  (*Id.*)

**C.    State Agency Reports**

**1.    Mental Impairments**

On June 25, 2019, Juliette Savitscus, Ph.D., opined that Lackner had moderate limitations in all four areas of the "paragraph B" criteria.  (*Id.* at 92.)  Lackner could perform one, two, and three step tasks and could do jobs that did not have demands for fast pace or high production requirements.  (*Id.* at 97.) Lackner could work in settings where contact with the public, supervisors, and coworkers was intermittent and superficial. (*Id.* at 98.)  She could perform tasks that involved few changes that are explained.  (*Id.*)

On October 25, 2019, Paul Tangeman, Ph.D., affirmed Dr. Savitscus' findings.  (*Id.* at 109-10, 114-16.)

**2.    Physical Impairments**

On June 18, 2019, Lina Hall, M.D., opined Lackner could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and had an unlimited ability to push and/or pull, other than shown for lift and/or carry.  (*Id.* at 94-95.)  Lackner could frequently climb ramps and stoop, crouch, and crawl, but could never climb ladders, ropes, and scaffolds.  (*Id.* at 95.)  She had an unlimited ability to balance and kneel.  (*Id.*)  Lackner had to avoid concentrated exposure to extreme cold and all exposure to hazards.  (*Id.* at 95-96.)

On October 24, 2019, William Bolz, M.D., affirmed Dr. Hall's findings.  (*Id.* at 112-14.)

**D.    Hearing Testimony**

During the July 14, 2020 hearing, Lackner testified to the following:

13

- She lived alone with her two children, who were two and a half years old and five months old.  (*Id.* at 69.)  Her family comes and helps her with her children and drives her to all appointments and to the grocery store.  (*Id.* at 70-71.)  She does not hold a driver's license.  (*Id.* at 71.)  She plans to get a license once her doctors release her from driving restrictions.  (*Id.*)

- Her seizures started in 2017 with her son.  (*Id.*)  She filed for disability in 2019 after testing positive for lupus.  (*Id.* at 72.)  Her symptoms kept getting worse and her doctors, including her rheumatologist, told her she needed to file for Social Security.  (*Id.*)  She could not work full-time because she got chills, bad anxiety, and stress when she was working before, which would cause her to go into a lupus flare and her legs, hands, and arms would swell up.  (*Id.* at 72-73.)  She also gets bad tremors throughout her body when she gets stressed.  (*Id.* at 73.)

- She had gone to the emergency room more than ten times in the past few years.  (*Id.*)  She was admitted multiple times in 2018 because of her seizures.  (*Id.* at 74.)  She tends to have seizures when she gets really stressed out or anxious.  (*Id.*)

- She was currently in a lupus flare.  (*Id.* at 75.)  Her lupus flares are not under control and happen at random times.  (*Id.*)  They could happen for two to three weeks or they could happen once a week or once a month.  (*Id.*)  She has not had a month in the past few years where she did not have a lupus flare.  (*Id.*)  During lupus flares, her legs tend to swell, the circulation in her feet is bad, her feet and hands become ice cold, her face, ears, and cheeks turn completely red, she gets a rash, she feels nauseous so that she cannot eat or drink, she gets constipated, she gets very fatigued, and she cannot really move.  (*Id.*)  She spends most of her time lying down because she cannot walk, and her knees tend to give out.  (*Id.*)  Her mother or grandmother will come over to help or stay with her.  (*Id.* at 76.)

- Her grandmother comes over one to three times a week to help her.  (*Id.*)  Her mother works but tries to come over as often as possible, usually once or twice a week.  (*Id.*)  Her little sister comes with her mom and helps as well.  (*Id.*)  She mainly stays in her apartment because she lives on the second story and it is hard for her to walk up and down the steps.  (*Id.*)  She naps when her children nap because she is so tired.  (*Id.* at 78.)  She does not get out of bed until noon or 1:00 p.m. because it takes her a few hours to function and get her whole body moving without pain.  (*Id.*)

- She has a hard time showering because when she gets out of the shower her whole body is in a lot of pain and her feet and legs are blue and purple when she gets out.  (*Id.* at 77.)  Her muscles relax in the shower and tense up when she gets out, causing spasms.  (*Id.*)

- During her last job, it took her a while to understand and remember the numbers to log into her account at the cash register or counter.  (*Id.*)  She has a learning disability and so someone has to read things out loud to her in order for her to understand.  (*Id.*)

14

The ALJ informed the VE there was no past relevant work. (*Id.* at 80.) The ALJ then posed the following hypothetical question:

> [A]ssume an individual of her age[,] education, less than high school, and work experience, which is none. This individual would be limited to light work as defined by the regulations. Further limited to frequent climbing of ramps and stairs. No climbing of ladders, ropes and scaffolds, frequent stooping and frequent crouching. This individual is further limited to frequent crawling, but needs to avoid all exposure to unprotected heights, moving mechanical parts. Avoid concentrated exposure to extreme cold. Is able to perform simple tasks and follow simple instructions in a non-fast paced production environment i.e., no assembly-line production. And this work environment should have few, if any, workplace changes. Can that individual be able to perform any jobs in the national economy?

(*Id.*) The VE testified the hypothetical individual would be able to perform representative jobs in the economy, such as office helper, marker, and routing clerk. (*Id.*)

The ALJ then posed a second hypothetical where:

> [T]his individual is limited for standing and walking no more than three hours, in an eight-hour workday, but only a half hour at a time before having to change positions, able to sit up to five hours in an eight-hour workday. This person can occasionally climb and stoop, but never balance, crouch, kneel, or crawl. This person can only occasionally perform reaching, as well as fine and gross manipulation. This person can only occasionally do push and pull with the upper extremities. And this person would also need an additional rest time during the workday on the average of two hours. Can that individual be able to perform any jobs in the national economy?

(*Id.* at 81.) The VE testified there would be no work as "the requirement for an extra two hour break . . . would put that person off-task greater than ten present of the workday." (*Id.*) In response to further questioning from Lackner's counsel, the VE testified that even if the extra two-hour break was removed, there would still be no work at the light level of exertion because of "the limitation of standing and walking combined with only the occasional reaching, handling, and fingering." (*Id.* at 82.) The limitation to occasional reaching and handling would also preclude all sedentary work. (*Id.*)

### III.    STANDARD FOR DISABILITY

A disabled claimant may be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. § 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that **s**he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. § 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience.  *See* 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. § 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since March 14, 2019, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: gastroesophageal reflux disease (GERD); migraine headaches; psychogenic non-epileptic seizures (PNES); systemic lupus erythematosus; connective tissue disorder; Raynaud's phenomenon; chronic pain syndrome; anxiety disorder; attention-deficit hyperactivity disorder; mood disorder; depressive disorder; and posttraumatic stress disorder (PTSD) (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she could frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds. The claimant could frequently stoop, crouch, and crawl. She needs to avoid all exposure to unprotected heights and moving mechanical parts. The claimant should avoid concentrated exposure to extreme cold. She is able to perform simple tasks and follow simple instructions in a non-fast paced production environment (i.e.: no assembly line production). The work environment should have few, if any, workplace changes.

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on February **, 1998, and was 21 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 14, 2019, the date the application was filed (20 CFR 416.920(g)).

(Tr. 41-56.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

In her first assignment of error, Lackner argues that the ALJ erred in giving treating rheumatologist Dr. Warren's June 22, 2020 opinion "only 'limited' persuasive value" as the ALJ "erroneously focuses on limited range of motion findings instead of the totality of the medical evidence." (Doc. No. 13 at 13) (citation omitted).  Lackner argues the ALJ also erred in his assessment of consultative examiner Dr. Janco-Gidley's opinion, and the ALJ's RFC failed to include any restrictions regarding Lackner's ability to interact with others.  (*Id.*) (citation omitted).

The Commissioner responds that the ALJ did not err in evaluating the medical opinion evidence. (Doc. No. 15 at 5-9.)

Since Lackner's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See*

19

*Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources."  20 C.F.R. § 416.920c(a).  Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements.  20 C.F.R. §§ 416.920c(a), (c)(1)-(5).  However, supportability and consistency are the most important factors.  20 C.F.R. § 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions.  The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 416.920c(c)(2).

administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed Dr. Warren's opinion as follows:

On June 22, 2020, Dr. Warren completed an assessment regarding the claimant's physical capacity (Ex. 46F). The physician opined that the claimant

could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand/walk for a total of 3-hours in an 8-hour workday, and sit for a total of 5 hours (Ex. 46F at 1). According to Dr. Warren, the claimant could only rarely perform postural activities, but could occasionally balance and stoop (Ex. 46F at 1). The physician added that the claimant could rarely perform fine manipulation, could occasionally reach, push, pull, and perform gross manipulation and noted that environmental restrictions, such as heights, moving machinery, temperature extremes, pulmonary irritants, and noise all affected her impairments (Ex. 46F at 2). The undersigned finds this opinion has limited persuasive value. Although Dr. Warren is a specialist and had a treating relationship, his own clinical assessment of the claimant fails to support the degree of limitations he assessed. For example, the rheumatologist's examination of the claimant and notation that she had good passive range of motion in her upper and lower extremity joints, fails to support that she would only be able to rarely perform fine manipulation and only occasionally reach, push, pull and perform gross manipulation (Ex. 18F at 4). Therefore, the undersigned finds that this opinion has limited persuasive value.

(Tr. 55.)

The Court finds the ALJ erred in his evaluation of Dr. Warren's opinion. The ALJ discounted Dr. Warren's opinion because "his own clinical assessment of the claimant fails to support the degree of limitations he assessed." (*Id.*) The ALJ, without explanation beyond the notation that Dr. Warren found good passive range of motion in Lackner's extremity joints, stated Dr. Warren's examination "faile[ed] to support that she would only be able to perform fine manipulation and only occasionally reach, push, pull and perform gross manipulation." (*Id.*) But Dr. Warren did not base these limitations on range of motion; rather, he based them on tenderness in Lackner's upper arms and coldness in her fingers and toes. (*Id.* at 3955.) Furthermore, the ALJ relied on an examination from almost a year before to contradict Dr. Warren's opinion on this point. (*Id.* at 55, 1160.) In addition, the ALJ's analysis of Dr. Warren's opinion ignored the positive findings from that visit, which included tenderness along the medial aspect of left forearm and pain in the distal anterior aspect of the thighs with hip flexion against resistance. (*Id.*) The ALJ failed to address the other reasons underpinning Dr. Warren's opinions, including tenderness in Lackner's knees, paresthesia of her hands and feet, Raynaud's phenomenon, dependent purple discoloration of Lackner's feet and lower legs, left retrobulbar headaches, pain in her knees and proximal

aspects of her arms, and numbness in the fingers of both hands.  (*Id.* at 3948-49.)  While the Commissioner argues these proposed limitations were inconsistent with other opinion evidence and not properly supported by the record (Doc. No. 15 at 5), the ALJ did not so state.  (Tr. 55.)  Furthermore, Dr. Warren's 2020 opinion post-dated the state agency reviewing physicians' record review.  (*Id.* at 84-100, 102-18, 3948-49.)

Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g., White*, 572 F.3d at 281; *Bowen*, 478 F.3d at 746 ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of his reasoning.  "In these circumstances, the ALJ's failure to explain his decision deprived this court of a 'logical bridge between the evidence on the record and his conclusion," *Flesicher v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011), and left the Commissioner, in her brief on the merits . . . , to defend the ALJ's decision with impermissible, post-hoc rationalizations, *see S.E.C. v. Chenery*, 332 U.S. 194, 196 (1947)."  *Davidson v. Comm'r of Soc. Sec.*, Case No. 3:16CV2794, 2018 WL 1453472, at *2 (N.D. Ohio Mar. 23, 2018).  Because the ALJ's opinion does not permit the Court to follow the "reasoning and treatment of" Dr. Warren's opinion, the Commissioner's decision must be vacated and remanded for further proceedings.  *Id.* at *2 (quoting *Davis v. Comm'r of Soc. Sec.*, No. 1:16 CV 2446, 2018 WL 137779, at *10 (N.D. Ohio 2018)).

As this matter is already being remanded for error in the treatment of Dr. Warren's opinion, in the interest of judicial economy, the Court declines to reach Lackner's additional assignments of error.

23

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED for further consideration consistent with this opinion.

Date: April 5, 2022                                             *s/ Jonathan Greenberg*
                                                            Jonathan D. Greenberg
                                                            United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**